IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 4, 2019

**STATE OF TENNESSEE v. MARVIN STINNETT**

**Appeal from the Criminal Court for Shelby County**
**No. 17-05992      Jennifer Johnson Mitchell, Judge**

————————————————————

**No. W2019-00097-CCA-R3-CD**

————————————————————

The Defendant, Marvin Stinnett, was convicted by a Shelby County Criminal Court jury of two counts of attempted first degree murder, two counts of employment of a firearm during the commission of a dangerous felony, three counts of aggravated assault, one count of reckless endangerment and one count of possession of a firearm by a convicted felon, for which he received an effective sentence of thirty years in the Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence in support of his convictions for attempted first degree murder, aggravated assault, employment of a firearm during the commission of a dangerous felony, and possession of a firearm by a convicted felon. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Edwin C. Lenow, Memphis, Tennessee, for the appellant, Marvin Stinnett.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alexia Crump and Michael McCuster, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of a September 3, 2015 violent domestic dispute between the Defendant and his wife, Kimberly Thomas, that culminated with the Defendant's announcing that he was going to kill Kimberly[1] before firing his gun at her as she was attempting to leave with their child in the minivan in which her mother, Kewanna Thomas, and other family members had arrived to rescue her. The gunshot struck and severely injured Kewanna's boyfriend, a passenger in the vehicle. The Shelby County Grand Jury subsequently indicted the Defendant for two counts of attempted first degree murder, two counts of employing a firearm during a dangerous felony, three counts of aggravated assault, one count of reckless endangerment, and one count of possession of a firearm by a convicted felon.

At the Defendant's September 25-27, 2018 trial, the gunshot victim, Undray Jackson, testified that on the day of the shooting, he and other family members were preparing to go out to eat lunch when his girlfriend, Kewanna, received a telephone call. In response, the family went to the Defendant's home to pick up Kewanna's daughter, Kimberly. In addition to himself and Kewanna, the minivan in which they traveled contained Kewanna's mother, Sherry McNairy; Kewanna's nephew, Kamaron Simmons; and a ten-month-old baby who was "one of the little cousins."

When they arrived at the Defendant's home, Kewanna and Ms. McNairy got out of the minivan and knocked at the door and front window of the house for approximately 15 to 20 minutes before a "puffy-eyed" and distraught Kimberly, who was carrying her ten-month-old baby, Dante, came outside with the Defendant trailing behind her. Kimberly got inside the minivan with the baby and sat in the third row directly behind Mr. Jackson. Mr. Jackson testified that he was seated on the passenger side of the second row of seats, Kamaron was seated in the third-row driver's side, the baby cousin was in a booster seat in the second-row driver's side, Kewanna was in the front passenger seat, and Ms. McNairy was retrieving a car seat for Dante from a vehicle that was parked in the driveway.

Mr. Jackson testified that the driver's door of the minivan was open, and Ms. McNairy was walking toward the minivan when the Defendant, who was standing at the front of the vehicle, looked at Kimberly, frowned as if he were "real mad about something," reached into his pocket, and pulled out a small silver gun. Mr. Jackson said that when he saw the gun, he leaned over and put his hand out to protect Kimberly and her baby. The Defendant fired, and the bullet passed through Mr. Jackson's hand and into his stomach.

---

[1] For simplicity's sake, we will refer to the witnesses with the same last name by their first names. We will also refer to the child witness by his first name. We intend no disrespect in doing so.

Mr. Jackson testified that he fell to his knees but did not initially realize he had been shot until his hand began burning and he began to get very tired and sleepy. He vaguely recalled Ms. McNairy's jumping into the driver's seat, backing out, and racing away from the Defendant's home. He also faintly recalled Kewanna's flagging down a police officer and an ambulance arriving to transport him to the hospital. He did not remember very much else until he came back to full consciousness in the hospital at the end of October or beginning of November. He testified that the bullet went through his hand, entered his stomach, and remained lodged in his chest to the current day. He was seriously injured and had undergone a total of four or five separate operations to repair the damage. He stated that his spleen, part of his pancreas, and a portion of his large intestines had to be removed and that he still suffered to the present day from pain as a result of his injuries and surgeries. On cross-examination, he denied that he had ever made any sexual advances toward Kimberly or that the Defendant ever told him that he was not welcome at their home.

Fourteen-year-old Kamaron, who was 11 at the time of the shooting, testified that his grandmother knocked at Kimberly's door for a few minutes before a crying Kimberly, carrying Dante, came outside and got into the back row of seats of the minivan and sat down to the right of Kamaron. He stated that they were waiting for someone to retrieve Kimberly's belongings when he saw the angry-looking Defendant walk over to the minivan and reach his hand through the crack between the open driver's door and the vehicle. At the same moment, he heard a "loud bang," followed by the screams of Kimberly, his aunt, and his grandmother. He recalled his grandmother rapidly backing the minivan out of the driveway but momentarily blacked out from fear and did not come back to consciousness until they were traveling down the street. He said he was so frightened that he sat terrified and shaking in the back of the minivan. On cross-examination, he agreed that the Defendant was yelling and appeared angry before he fired the gun.

Ms. McNairy testified that she was at her home with her daughter Kewanna, Kewanna's boyfriend, and some children she was babysitting when she noticed that her granddaughter Kimberly was repeatedly calling Kewanna's cell phone, which was on its charger. She informed Kewanna, and after Kewanna answered Kimberly's call, the family all got into Ms. McNairy's minivan to go pick Kimberly up. In addition to the individuals that Mr. Jackson mentioned in his testimony as being passengers in the minivan, Ms. McNairy thought she recalled that there was a second baby with them at the time.

Ms. McNairy testified that she and Kewanna spent approximately 20 minutes calling aloud for Kimberly, ringing her doorbell, and knocking at her door after they arrived at her home. Although they could hear voices from inside the house, no one

answered the door. She said she was in the process of phoning the police when a frightened-looking Kimberly appeared at the door with baby Dante. She stated that she told Kimberly to get out of the house and pushed her and Dante toward the minivan. After Kimberly got inside the vehicle with Dante, she locked the vehicle's doors but she realized at that point that they had no car seat for Dante. She, therefore, turned to the Defendant and asked him to get the car seat. The Defendant went inside and returned with two diapers and some clothing for Dante but without a car seat. When she asked again, Kimberly told the Defendant where the car seat was located, and he went to a car parked in the driveway to retrieve it.

Ms. McNairy testified that after Kimberly had strapped Dante into his car seat, she turned around to get into the driver's seat of her minivan, saw the Defendant pull a silver gun out of his clothing, and called out to warn her family. The Defendant aimed the gun directly at Kimberly, said, "I'm going to kill you, bitch[,]" and fired one shot. She said she pushed her car door into the Defendant, jumped in the driver's seat, rapidly backed out of the driveway, and sped away from the house. She believed the Defendant had retrieved the gun from his car as he was getting the car seat. She testified that the Defendant's actions made her feel "scared" and "terrified." On cross-examination, she acknowledged inconsistencies between her trial testimony and her statement to police as to which pocket the Defendant pulled his gun from and how long she knocked at Kimberly's door before Kimberly came outside with Dante.

Kewanna testified that she was home babysitting her cousin's baby, "AJ," when her daughter Kimberly called and in a weepy, whispered voice asked her to come get her. The rest of her testimony, with minor variations, essentially mirrored that of her mother and her boyfriend, with the exception that she said there was only one baby in the car when they drove to Kimberly's home, that the gun was black, and that the Defendant dropped the car seat on the ground as he pulled out his gun. She testified that the Defendant aimed directly at Kimberly, who had Dante on her lap, said, "Bitch, I'm gonna kill you[,]" and fired. Kewanna stated that the Defendant yanked at the rear doors of the van as her mother was backing out of the driveway but was unable to open the door. She testified that she felt afraid when she saw the Defendant holding the gun.

On cross-examination, Kewanna acknowledged that although she tried to reach Kimberly on her cell phone, she never called the police during the thirty to forty-five minutes that she and her mother were outside Kimberly's house, despite the fact that she heard screaming and sounds of an argument inside. She further acknowledged that the Defendant appeared angry and upset throughout the encounter.

Kimberly testified that on September 3, 2015, she and the Defendant were arguing about something when the Defendant slapped her hard across the face, which was not an

unusual event in their marriage. She said she called her mother, Kewanna, to come get her because she wanted to give the Defendant time to cool down with her out of the house. She did not tell Kewanna what had happened because she believed that problems in a marriage should be kept between the married couple and had never disclosed to her family any of the episodes of domestic violence she had experienced. Kewanna called back on her land line, but Kimberly did not pick up the phone. Kewanna began calling her cell phone, and the Defendant took the phone from her, answered it, and held it up to her ear, where she heard Kewanna say that they were close to her house.

Kimberly testified that she tried to gather some clothes and supplies, but the Defendant would not let her. The Defendant also briefly took Dante from her, telling her that she was not leaving with their son, but he then relented and gave him back. At that point, she heard knocking at the door and the doorbell ringing. The Defendant was angry and agitated but eventually stopped talking, opened the door, and allowed her to leave with Dante. She then walked outside and sat with Dante in the middle seat of the third row of the minivan. Because the Defendant had given her Ms. McNairy a small booster seat instead of the correct car seat, her grandmother knocked on the door of the house and asked the Defendant for the correct seat. The Defendant retrieved the car seat from the car in the driveway and walked back with it toward the minivan where Ms. McNairy was waiting. Kimberly was looking down and did not see the Defendant with a gun but heard the sound of the gunshot followed by the screams of Ms. McNairy and the general panic of all of her family in the minivan. When she looked up, she saw Ms. McNairy jumping in the driver's seat of the van and yanking the gear shift to put the vehicle in reverse while the Defendant, gun in hand, tried to open the rear door.

On cross-examination, she acknowledged that the Defendant was angry and agitated. She admitted the Defendant had earlier told her that Mr. Jackson was not welcome at their home and that it was in reaction to Mr. Jackson's having made an inappropriate comment to her.

Memphis Police Officer Lakisha Shaw testified that she was patrolling with her partner at approximately 12:45 to 1:00 p.m. on September 3, 2015, when they were flagged down by a hysterical woman who directed them to a minivan in which she said her boyfriend had been shot. She said she noted that there were three young children in the back of the minivan and that all of the passengers were hysterical. Coincidentally, she recognized one of the young children as her cousin's child, who was only three or four months old at that time.

Memphis Police Officer Charles Cathey of the Crime Scene Unit identified photographs of the minivan. Lieutenant Glenn Barber of the Memphis Police

Department, who was assigned to the Domestic Violence Bureau at the time, testified that he issued a warrant for the Defendant's arrest on September 3, 2015.

Detective Justin Tutor of the Shelby County Sheriff's Department's Fugitive Apprehension Team testified that they arrested the Defendant on April 25, 2017, after receiving a tip as to his location. He said the Defendant initially fled when he saw them but was eventually apprehended after a struggle.

The Defendant elected not to testify and presented no witnesses in his defense. Following deliberations, the jury convicted him of two counts of attempted first degree murder, two counts of employing a firearm during the commission of a dangerous felony, three counts of aggravated assault, and one count of reckless endangerment.

During the second phase of the trial, Heidi Herron of the Shelby County Criminal Clerk's Office identified a certified copy of the Defendant's 2011 conviction for aggravated assault. Following further deliberations, the jury convicted the Defendant of unlawful possession of a firearm by a convicted felon. The trial court subsequently sentenced the Defendant as a Range I, standard offender to an effective sentence of thirty years in the Department of Correction.

## ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence in support of his convictions, arguing that there was insufficient proof of premeditation to support the attempted first degree murder convictions and insufficient proof that Kewanna, Kamaron, Dante, or the other baby were in imminent danger such as to support convictions for aggravated assault and reckless endangerment. The State responds by arguing that the evidence was sufficient to sustain the convictions and, further, that the Defendant has waived any challenge to the sufficiency of the evidence in support of his firearm convictions by failing to provide any argument or citations to the record. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The victims of the Defendant's convictions for attempted first degree premeditated murder were the Defendant's wife, Kimberly Thomas, and Undray Jackson. First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee

Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. An additional factor from which a jury may infer premeditation is evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

The Defendant cites the testimony that he appeared angry and agitated at the time of the shooting in support of his argument that there was insufficient proof of premeditation. He also cites the evidence that Mr. Jackson had previously made sexual advances towards the Defendant's wife to suggest that he was so enraged at the fact that his wife was in a vehicle with Mr. Jackson that his firing of his weapon at them occurred in a "heat of passion" type moment that is more supportive of convictions for attempted voluntary manslaughter than attempted premeditated murder. However, when viewed in the light most favorable to the State, the evidence is sufficient to show that the Defendant was sufficiently free of passion and excitement at the time of the shooting to be capable of premeditation at the time he fired his gun. There was proof from which the jury could have found that the Defendant harbored animus toward Mr. Jackson, that he retrieved the gun from his vehicle as he was getting the car seat, that he pulled the gun from his pocket after he walked back to the minivan, that he announced his intention of killing his wife, and that he took aim and fired in the direction of his wife and of Mr. Jackson, who was sitting in front of the Defendant's wife in the second row of seats of the minivan. We, therefore, conclude that the evidence is sufficient to sustain the Defendant's convictions for attempted first degree murder.

The Defendant also challenges the sufficiency of the evidence in support of his convictions for the aggravated assaults of Kewanna Thomas and Kamaron Simmons and the reckless endangerment of the two babies. The Defendant's only argument with respect to these convictions is that none of the named victims were in "imminent danger" from his actions. The convictions for aggravated assault, however, were not based on the victims being in imminent danger but instead on their being in fear from the Defendant's use or display of a deadly weapon. To sustain the convictions for aggravated assault as charged in this case, the State had to prove beyond a reasonable doubt that the Defendant intentionally or knowingly caused both Kewanna and Kamaron to reasonably fear imminent bodily injury by his use or display of the gun. See Tenn. Code Ann. § 39-13-101 (a)(2); -102 (a)(1)(A)(iii). Both Kewanna and Kamaron expressed their fear for their

lives based on the Defendant's firing his gun into the vehicle in which both were passengers. We, therefore, conclude that the evidence was sufficient to sustain those convictions.

We further conclude that the evidence, when viewed in the light most favorable to the State, was also more than sufficient to sustain the Defendant's conviction for reckless endangerment in which the named victims were the two infant passengers in the vehicle at the time of the shooting. To sustain the conviction for felony reckless endangerment, the State had to prove beyond a reasonable doubt that the Defendant recklessly engaged in conduct that either placed or might have placed the babies in imminent danger of death or serious bodily injury and that the reckless endangerment was committed with a deadly weapon. Tenn. Code Ann. § 39-13-103 (a)(2). The proof at trial showed that the Defendant fired his gun into the vehicle toward his wife, who had Dante on her lap and who was sitting in the immediate vicinity of the other baby passenger. From this evidence, a jury could have reasonably found the Defendant guilty of felony reckless endangerment of the two babies.

Finally, we agree with the State that the Defendant has waived his challenge to the sufficiency of the evidence in support of his firearm-related convictions by failing to make any argument or provide citations to the record. A defendant who fails to make an argument on an issue or appropriate citations to the record waives the issue on appellate review. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10 (b).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE